JUDE G. GRAVOIS, Judge.
 

 This appeal concerns the validity of a last will and testament executed on August 2, 2007 by decedent, Charles J. Spitzfaden, III. Appellant, Digna (Dee) Hunter Spitz-faden, Mr. Spitzfaden’s widow, appeals the trial court judgment herein that refused to invalidate Mr. Spitzfaden’s will on the basis that he lacked testamentary capacity and was subject to undue influence. On appeal, Mrs. Spitzfaden argues that the trial court erred relative to the parties’ burdens of proof. She also argues that the will is invalid because all the requirements of LSA-C.C. art. 1577 were not met, in particular, that the testator could not read. Finally, she argues that the will was a product of the undue influence of Mr. John Stassi, Mr. Spitzfaden’s cousin and the proponent of the will.
 

 After thoroughly and carefully considering the law and the evidence, we affirm the trial court’s judgment.
 

 [¿FACTS AND PROCEDURAL BACKGROUND
 

 Charles J. Spitzfaden III died on September 25, 2007. He was survived by his widow, Dee. Dee had two adult children from a prior marriage, Russell Hunter and Lori Mabile. Mr. Spitzfaden was an only child and had no children of his own.
 

 At the time of his death, Mr. Spitzfaden had been in hospice care for several months. He suffered from chronic ob-
 
 *90
 
 struetive pulmonary disease, emphysema, diabetes, and other serious chronic ailments. He did not suffer from dementia. Mr. Spitzfaden was in pain and had very limited physical mobility. He received many medications on a daily basis, including extended release morphine for pain that was supplemented as needed with other narcotic pain medication.
 

 The evidence and testimony at the trial show that Mr. Spitzfaden executed a will in 2005 and several wills during the last months of his life. He executed a will on February 26, 2005 with attorney Charles Nunez serving as notary. He executed a will on April 11, 2007 while in the hospital before Mr. Stassi as notary. Another will was executed by Mr. Spitzfaden on May 4, 2007 with Blair Bright, Mr. Stassi’s son-in-law, acting as notary. On June 29, 2007, he executed a will with Patricia Dean serving as notary. Lastly, on August 2, 2007, Mr. Spitzfaden executed the will that is the subject of this appeal. When he died, Mr. Stassi was in the process of drafting yet another will for Mr. Spitzfaden that remained unfinished at the time of his death.
 

 The will at issue here named Mr. Stassi as independent executor without bond. In this will, Mr. Spitzfaden left a special legacy to his wife of their residence in full ownership, with her having the option of alternatively selecting one of his rental houses instead, provided she renounce her interest in their residence in favor |4of the trust established by the will.
 
 [1]
 
 He also left her the contents of their residence in full ownership and the sum of $50,000 outright. Her children, Lori and Russell, were also left special legacies of $50,000 each. Russell also received decedent’s truck. Dee, Lori, and Russell were also each left the special legacy of a choice of one of decedent’s guns, the rest of which went to Mr. Stassi as a special legacy. The Louisiana Society for the Prevention of Cruelty to Animals was given a special legacy in the amount of $25,000.
 

 The residue of Mr. Spitzfaden’s estate went into a trust from which the income would be accumulated. Mr. Stassi was named trustee. Dee was to receive a lifetime monthly allowance of $4,000, and Russell was to receive a monthly allowance of $2,000 following Dee’s death until termination of the trust as to his interest therein. Subject to those monthly allowances, Russell and Lori were to be the principal and income beneficiaries of the trust in proportion of which $500,000 bore to the initial corpus. The decedent’s second cousins (Mr. Stassi’s five children and his brother’s two children), the seven of whom are listed by name, were to be the principal and income beneficiaries of the trust in proportion of which the initial corpus minus $500,000 bore to the initial corpus. The will provided for termination of the trust as to all beneficiaries’ interests on Dee’s death, with the exception of Russell’s interest, which would terminate on Lori’s death.
 

 On October 3, 2007, Mrs. Spitzfaden filed a Petition for Notice of Application for Appointment of Administrator. On the same day, she also filed an Opposition to Probate of Testament, alleging that, on information and belief, John Stassi would try to probate a purported statutory testament of Mr. Spitzfaden dated [,-August 2, 2007. In her Opposition, Mrs. Spitzfaden further alleged that Mr. Spitzfaden was terminally ill and heavily medicated prior to and at the time of the execution of the
 
 *91
 
 document, was in hospice care, and therefore was not of sound mind and lacked capacity under Louisiana law to execute a last will and testament.
 

 On October 9, 2007, Mr. Stassi filed a Petition requesting the filing and execution of Mr. Spitzfaden’s August 2, 2007 will, and for appointment as independent testamentary executor, attaching the will, as well as affidavits of death, domicile and heirship.
 

 Mrs. Spitzfaden filed an opposition to Mr. Stassi’s petition, again alleging that Mr. Spitzfaden lacked testamentary capacity due to being heavily medicated prior to and on the date of the will’s execution. Additionally, she alleged that the testament was null and void due to the undue influence of Mr. Stassi upon the decedent, as per LSA-C.C. art. 1479. Mrs. Spitzfa-den later filed a supplemental and amended opposition, arguing that the testament was also invalid because it was not executed before the notary or all the witnesses who signed the document.
 

 Following a two-day hearing, the trial court allowed the parties to file post-trial memoranda. On July 23, 2008, the trial court rendered judgment, finding that Mrs. Spitzfaden failed to prove that Mr. Spitzfaden was mentally incompetent, and therefore the testament was valid. The judgment was silent regarding the issue of undue influence. Mrs. Spitzfaden thereupon timely filed this appeal.
 

 ANALYSIS
 

 LSA-C.C. art. 1482 provides that a person who challenges the capacity of a donor must prove by
 
 clear and convincing evidence
 
 that the donor lacked capacity at the time the donor made the donation inter vivos or executed the testament. The jurisprudence is clear that “testamentary capacity is always presumed and the | (¡burden is on the party attacking the validity of the will to prove a lack of capacity at the time the will was executed.”
 
 Succession of Dorand,
 
 596 So.2d 411, 412 (La.App. 4 Cir.1992).
 

 The factual findings of the trial court, in will contest cases, are afforded great weight and will not be set aside on appeal absent manifest error.
 
 Succession of Nette,
 
 04-437 (La.App. 5 Cir. 11/16/04), 890 So.2d 16.
 

 Burden of Proof
 

 Initially, we note that Mrs. Spitzfaden argues that the trial court incorrectly placed the burden on her to prove the will’s validity, not upon the proponent, Mr. Stassi.
 

 At the contradictory trial to probate a testament, its proponent bears the burden of proving the authenticity of the testament, and its compliance with all of the formal requirements of law. LSA-C.C.P. art. 2908. We note that at trial, Mrs. Spitzfaden specifically did not contest the authenticity of the signatures of the testator, witnesses, or notary. Thus, Mr. Stassi has met his burden of proving the authenticity of the testament. Also, based on the evidence presented, it is clear that the testament in question was executed in compliance with all of the formal requirements of law. As such, we find that the trial court correctly found that Mrs. Spitz-faden bore the burden of proving testamentary incapacity.
 

 Testamentary Capacity
 

 To have capacity to make a donation
 
 inter vivos
 
 or
 
 mortis causa,
 
 a person must be able to comprehend generally the nature and consequences of the disposition that he is making. LSA-C.C. art. 1477. Furthermore, under LSA-C.C. |7art. 1471, the capacity to donate
 
 mortis causa
 
 must
 
 *92
 
 exist at the time the testator executes the testament.
 

 Mrs. Spitzfaden argues that she presented proof through the testimony of .Elaine Floyd, the hospice nurse who cared for her husband, that he needed a magnifying glass to read. The testimonies of the notary and the witnesses to the execution of the August 2, 2007 will, she points out, make no reference to Mr. Spitzfaden using a magnifying glass to read the document. Therefore, she argues, the proponent’s (Mr. Stassi) evidence of the testator’s ability to read, and that he did read the testament prior to signing it, falls far short of his burden of proof. It should be noted at this point, however, that the evidence is uncontradicted that Ms. Floyd did not care for Mr. Spitzfaden on the day he executed the August 2, 2007 will.
 

 Mr. Stassi argues in brief, however, that Mrs. Spitzfaden failed to present this issue to the trial court, and therefore this court is precluded from considering it under Uniform Rules, Courts of Appeal, Rule 1-3. He further argues on the merits that there was sufficient evidence that Mr. Spitzfaden could read and did read the will at issue, and thus Mrs. Spitzfaden has failed in her burden of proof.
 

 Uniform Rules, Courts of Appeal, Rule 1-3 states:
 

 The scope of review in all cases within the appellate and supervisory jurisdiction of the Courts of Appeal shall be as provided by LSA-Const. Art. 5, § 10(B), and as otherwise provided by law. The Courts of Appeal will review only issues which were submitted to the trial court and which are contained in specifications or assignments of error, unless the interest of justice clearly requires otherwise.
 

 Mrs. Spitzfaden’s pleadings specifically argued that Mr. Spitzfaden lacked testamentary capacity at the time the will was executed because he was terminally ill and heavily medicated with narcotic pain medication. LSA-C.C.P. art. 2902 requires that the “opposition to the petition for the probate of a testament shall | ^comply with Article 2972, shall allege the grounds of invalidity of the testament relied on by the opponent, and shall be served upon the petitioner for the probate of the testament.” Mrs. Spitzfaden’s pleadings never raised the issue that her husband needed a magnifying glass to read, nor was that issue argued at the contradictory hearing. After Mr. Stassi and the witnesses to the August 2, 2007 testament established compliance with all the formalities required by law by testifying that they saw Mr. Spitz-faden read the will in their presence, the matter was not further explored. Accordingly, the trial court never considered the issue of whether Mr. Spitzfaden needed a magnifying glass to read.
 

 Mrs. Spitzfaden does not show that the interests of justice require this court to consider this issue on appeal. Accordingly, because the issue was not raised first in the trial court, this court will not consider it on appeal.
 
 [2]
 

 Undue Influence
 

 The judgment of the trial court is silent as to Mrs. Spitzfaden’s claim that
 
 *93
 
 her husband was unduly influenced by Mr. Stassi. As a general rule, where a judgment is silent with respect to any demand which was at issue in the case under the pleadings such silence constitutes a rejection of that demand.
 
 Southern Marine Sales, Inc. v. Matherne,
 
 05-181 (La.App. 5 Cir. 11/29/05), 915 So.2d 1042.
 

 A donation
 
 inter vivos
 
 or
 
 mortis causa
 
 shall be declared null upon proof that it is the product of influence by the donee or another person that so impaired the volition of the donor as to substitute the volition of the donee or other person for the volition of the donor. LSA-C.C. art. 1479.
 

 laConcerning the type of influence that would result in the invalidity of a donation, Comment (b) to Article 1479 (emphasis added) provides in pertinent part:
 

 [Ejveryone is more or less swayed by associations with other persons, so this Article attempts to describe the kind of influence that would cause the invalidity of a gift or disposition. Physical coercion and duress clearly fall within the proscription of the previous Article. The more subtle influences, such as creating resentment toward a natural object of a testator’s bounty by false statements, may constitute the kind of influence that is reprobated by this Article, but will still call for evaluation by the trier of fact. Since the ways of influencing another person are infinite, the definition given in this Article is used in an attempt to place a limit on the kind of influence that is deemed offensive.
 
 Mere advice, or persuasion, or kindness and, assistance, should not constitute influence that would destroy the free agency of a donor and substitute someone else’s volition for his own.
 

 When seeking to annul a donation on the basis of undue influence, it is not sufficient to merely show that the donee exercised some degree of influence over the donor; instead, the challenger must show that the donee’s influence was so substantial that the donee substituted his or her volition for that of the donor.
 
 In re Succession of Berman,
 
 05-0641 (La.App. 4 Cir. 7/26/06), 937 So.2d 437.
 

 The burden of proof for one challenging a donation based on “undue influence” is found in LSA-C.C. art. 1483:
 

 A person who challenges a donation because of fraud, duress, or undue influence, must prove it by clear and convincing evidence. However, if, at the time the donation was made or the testament executed, a relationship of confidence existed between the donor and the wrongdoer and the wrongdoer was not then related to the donor by affinity, consanguinity or adoption, the person who challenges the donation need only prove the fraud, duress, or undue influence by a preponderance of the evidence.
 

 The record shows that Mr. Stassi was Mr. Spitzfaden’s first cousin. Because he is a relative of the decedent, LSA-C.C. art. 1483 requires that Mrs. Spitzfaden show undue influence by clear and convincing evidence, rather than by a mere preponderance of the evidence.
 

 InAs proof that Mr. Stassi had undue influence over her husband in the execution of the last will and testament in question, Mrs. Spitzfaden argues: 1) that each successive version of the will gave Mr. Stassi greater control over the estate as executor and greater control over the trust estate as trustee; 2) that the provisions in the August 2, 2007 will are inconsistent with what the decedent told Lori, her daughter, she and her brother would be inheriting from him; 3) that the proponent’s case largely rests on the testimony of only one witness, Mr. Stassi; 4) that the will was the product of misrepresentation
 
 *94
 
 of its contents to a man who was, because of his dragged condition, overly susceptible to suggestion and was unable to read the will for himself; 5) that the contents of the will were misrepresented to the decedent because there was no testimony that the wills were read or explained to him; and 6) there was no testimony by anyone that shows that she or her children ever did anything that might cause Mr. Spitzfaden to diminish their participation in his estate, and would thus cause Mr. Spitzfaden to enrich Mr. Stassi’s children at her children’s expense.
 

 Essentially, Mrs. Spitzfaden contends that Mr. Stassi exerted undue influence over Mr. Spitzfaden because he was weakened by his poor physical condition and his medication, and thus easily influenced, and because the final will did not reflect what she and decedent had talked over during the years.
 

 The testimonies of all the witnesses, however, paint a different picture of a man who, though weakened by several debilitating conditions, had a firm grasp of what he owned and what he wished to do with it.
 

 Mr. Stassi had known Mr. Spitzfaden “all his living memory” and the two enjoyed a close relationship. According to Mrs. Spitzfaden, Mr. Stassi was the only family member who showed an interest in her husband. She would call him to visit when Mr. Spitzfaden was feeling down.
 

 | nAs a lawyer, Mr. Stassi’s practice concentrated on wills and estate matters. After Mr. Spitzfaden became ill and after he learned that his former attorney had died, he asked Mr. Stassi’s help in drafting his will and setting up the trust(s) that the various wills contained.
 

 Mr. Stassi communicated regularly with Mr. Spitzfaden during the time period between February and his death in September. Mr. Spitzfaden had clear ideas of how he wanted to leave his property. Mr. Spitzfaden would tell Mr. Stassi what he wanted, and Mr. Stassi would draft the wills expressing Mr. Spitzfaden’s requests in legal terms that would accomplish his wishes. Despite Mr. Spitzfaden’s lack of post-high school education, he was a smart man who had a good grasp of exactly what he owned and how he wanted to dispose of it, as evidenced by the notes that Mr. Spitzfaden dictated to Mr. Stassi regarding his assets.
 

 As indicated by his various notes, Mr. Stassi and Mr. Spitzfaden began drafting wills around February of 2007. Mr. Stassi stated that during all of his discussions with Mr. Spitzfaden, as well as the three times they executed wills (April, May, and August 2, 2007), Mr. Spitzfaden was “fíne” and in control of his faculties, though he was a little depressed by his physical condition and did complain about being sick.
 

 Mr. Stassi told Mr. Spitzfaden that he did not want him to leave anything to him, as he had done in at least one prior will, but suggested he leave it to the next generation, which would be his children and his brother’s children.
 
 [3]
 

 At the time of Mr. Spitzfaden’s death, Mr. Stassi was in the process of drafting another will that would have rendered the August 2, 2007 will invalid had 11git been properly executed. The provisions of that draft will made changes to the August 2, 2007 will, such as reducing the portion of the trust that would benefit Lori and Russell to $300,000 from $500,000. Mr. Stassi agreed that the change would have benefited the Stassi legatees, but he did not
 
 *95
 
 rush the preparation of that will, and in fact never completed it.
 

 According to Mr. Stassi, Mr. Spitzfaden did not want his wife to know he was drafting these wills for him. Her children’s testimony was consistent with this.
 
 [4]
 
 The wills Mr. Stassi drafted were all executed at times when Mrs. Spitzfaden would specifically be absent.
 

 The evidence shows that in certain ways, the will in question did reflect terms that Mrs. Spitzfaden had discussed with her husband. For instance, she testified that she knew the will would set up a trust to provide for her because of certain judgments recorded against her.
 

 Mr. Spitzfaden supplied no reasons to Mr. Stassi initially for how he disposed of his property in the wills, only that he had been “thinking about it.” Mr. Stassi did not ask Mr. Spitzfaden why he made the particular provisions he did, nor did he ask him why he later changed specific bequests in the subsequent wills. He did not believe it was his business to question a client about their reasons. Later, during the drafting of the August 2, 2007, Mr. Spitzfaden told Mr. Stassi that he was upset with Lori because she had caused the “Patricia Dean” will to be drafted, and because that will lowered Dee’s allowance against his wishes.
 
 [5]
 
 As a result, she was not named a trustee in the August 2, 2007 will, although she was still the manager of the rental houses in LaPlace that decedent owned.
 

 11sMr. Stassi’s testimony was firm and clear that Mr. Spitzfaden made all of the decisions regarding how to dispose of his property, and that he, Mr. Stassi, never influenced him or asked his reasons for the provisions in his will. Mr. Stassi was sure Mr. Spitzfaden understood how a trust worked.
 

 The witnesses to the May 4, 2007 and the August 2, 2007 wills related, by live testimony and deposition, their impressions of Mr. Spitzfaden’s mental condition as observed by them on the various days they were in his presence to witness his signatures on the wills. Each felt that Mr. Spitzfaden, while physically weak, was “normal” and completely cognizant of his surroundings, as evidenced by his conversations with them as the will was signed. In particular, Mr. Robert Peyton and his son, who witnessed the August 2, 2007 will and were cousins of Mr. Spitzfaden, clearly testified that Mr. Spitzfaden knew what was going on and why they were there. While this evidence would also go to testamentary capacity, which, as set forth above, is not at issue here, it is also evidence that contradicts Mrs. Spitzfaden’s picture of a man who was too medicated to know what he was doing and therefore was susceptible to influence.
 

 Mrs. Spitzfaden offers no countervailing evidence of undue influence other than conclusory statements about Mr. Spitzfa-den’s generally poor medical condition and the will’s actual terms being different than what she expected.
 

 This court, in
 
 In re Succession of Linder,
 
 02-106 (La.App. 5 Cir. 7/30/02), 824 So.2d 523, affirmed a trial court judgment that rejected a plaintiffs similarly result-
 
 *96
 
 oriented challenge to a testament based on undue influence.
 

 We find in this case that the evidence failed to show that Mr. Stassi exerted undue influence over Mr. Spitzfaden in the execution of his will. The evidence is clear and convincing instead that Mr. Spitzfaden had his own ideas and gave clear and detailed instructions to Mr. Stassi as to how he wanted to dispose of his estate. |
 
 u
 
 Mr. Spitzfaden chose his cousin, Mr. Stas-si, to draft his will, a choice that was very logical and understandable given the lifelong close family and personal relationship that existed between Mr. Stassi and Mr. Spitzfaden, and Mr. Stassi’s professional expertise in wills and estate matters.
 

 CONCLUSION
 

 For the above reasons, we affirm the trial court’s judgment in this case upholding the validity of Mr. Spitzfaden’s last will and testament executed on August 2, 2007.
 

 AFFIRMED.
 

 [1]
 

 . Mr. Stassi testified that though it appeared that Mr. Spitzfaden owned their matrimonial residence separately, Mrs. Spitzfaden had a counter letter establishing her half ownership interest in the property. This detail, remembered by Mr. Spitzfaden after the execution of the April 11, 2007 will, led to a codicil to that will.
 

 [2]
 

 . Similarly, in
 
 In re Succession of Abdalla,
 
 99-0979 (La.App. 3 Cir. 6/28/00), 764 So.2d 362, the granddaughter of the testator opposed on various specific grounds the tableau of distribution regarding several disbursements and the amounts of executor fees. In her first assignment of error, she opposed the executors' fees on the new grounds that the co-executors failed to establish a prima facie showing that they had complied with the notice requirements of LSA-C.C.P. art. 3304. The Court of Appeal refused to consider the assignment of error, citing Rule 1-3, because she did not raise that issue on the trial court level.
 

 [3]
 

 . It is noted that in at least one previous will executed by Mr. Spitzfaden, he had bequeathed Mr. Stassi and his brother each 25% of his estate in outright ownership. This was a will that was drawn up by Mr. Spitzfaden’s previous attorney, not Mr. Stassi.
 

 [4]
 

 . Lori, who was responsible for the will before Patricia Dean as notary, also had the decedent sign it at a time when her mother was not present.
 

 [5]
 

 . Mr. Spitzfaden’s May 4, 2007 will provided Dee with an income of $4,000 per month. The June 29, 2007 will drafted by Ms. Dean lowered Dee’s allowance to $3,500 per month. Lori testified that this was Mr. Spitz-faden's wishes. In the probated will, Dee's allowance of $4,000 per month was restored.